UNITED STATES of America for the Use and Benefit of Gerald S. GOODMAN

v.

R. P. FARNSWORTH & COMPANY, Inc. and Aetna Casualty & Surety Company.

Civ. A. No. 7393.

United States District Court
W. D. Louisiana,
Lake Charles Division.

Aug. 17, 1962.

Kenneth G. Burgess, Shreveport, La., for plaintiff.

Deutsch, Kerrigan & Stiles, New Orleans, La., for defendants.

HUNTER, Judge.

This case involves:

(a) A conventional assignee's claims against the prime contractor for a subcontractor's retainage in a federal construction project, and

(b) The prime contractor's opposition thereto pegged on the contention that the amount of the retainage was exceeded by the prime's backcharges against the sub for defective work.

The suit is brought under the Miller Act (40 U.S.C.A. § 270a et sequa). Defendant, R. P. Farnsworth & Company, Inc. was the government's prime contractor, and defendant Aetna Casualty and Surety Company was its surety.

James Thames, doing business as the Dixie Paving Company, was one of Farnsworth's subcontractors. One contract was dated June 18, 1956 for excavation and pouring slabs and driveways for the housing and was in the final amount of $268,204 (Exh. D-2). Thames' other subcontract was dated August 22, 1956, in the amount of $108,501 and was for certain street paving work (Exh. D-1).

In October of 1956 by means of a take-over agreement, Farnsworth completely bought Thames out for the uncompleted portions of the subcontracts, even to the purchase of materials and equipment on the job site. The terms of the agreement which was entered into on October 31, 1956, are shown in Exhibit D-3. In pertinent part, this agreement provided that Farnsworth would hold $15,556.93 of the funds due Dixie for completed work as security against defects later found in Dixie's work at the time of the government's inspection, as follows:

"11—FARNSWORTH shall retain the unpaid balance of $15,556.-93 which is 10% of the $155,-569.25 total value of the work done by THAMES under said subcontracts. Said retainage consists of $14,010.64 of the $140,126.35 value of work done under the June 18, 1956 sub-contract, and $1,546.29 of the $15,462.90 value of the work done under the August 22, 1956 subcontract.

"This retained $15,556.93 shall be paid by FARNSWORTH to THAMES and GREAT AMERICAN jointly within five days after receipt of the final payment due on the May 29, 1956 prime contract which shall become due after completion of all work and final written acceptance thereof by the CORPS OF ENGINEERS, UNITED STATES ARMY.

"12—FARNSWORTH shall give written notice to THAMES and GREAT AMERICAN of any defects in the work done by THAMES within five days of the discovery thereof, and THAMES and GREAT AMERICAN shall have five days from receipt of such notice in which to inspect the work complained of. FARNS-WORTH shall be entitled to correct the defective work at THAMES' expense and may at its option deduct the cost thereof from the money retained.

"13—FARNSWORTH shall be entitled also to deduct from the retained money an amount sufficient to pay any unpaid claims which may be presented for debts incurred by THAMES in connection with the work done by him before October 29, 1956.

"14—Should the cost of correcting any such defective work covered by, and any such unpaid claims against, the June 18, 1956 subcontract exceed the $14,010.64, retained by FARNSWORTH thereunder, then THAMES and/or GREAT AMERICAN, as his surety, shall pay or cause to be paid the excess to FARNSWORTH.

"15—Should the cost of correcting any such defective work covered by, and any such unpaid claims against, the August 22, 1956 subcontract exceed the $1,546.29 retained by FARNS-WORTH thereunder, then THAMES shall pay the excess to FARNSWORTH."

At the time Dixie terminated its work and Farnsworth took over, all of the street paving and sixty-seven separate duplex concrete slabs had already been poured. Farnsworth knew generally that some of this work might be found defective and it is for that reason that retainage was held under the October 31st agreement (Tr. pgs. 123–124).

In December, 1956 Dixie (Thames), conventionally assigned to plaintiff Goodman its interest in the $15,556.93 retainage. Goodman as well as Thames were both represented by Mr. Charles Peters, prominent attorney of Shreveport, Louisiana.

Later when Dixie's work began to be inspected by the government's engineers, defects were found. The concrete did not meet required specifications for levelness nor did it come within the owner's tolerance of $1/8''$ thereof (Tr.

11–12). The government engineers proceeded to notify Farnsworth by letter dated April 18, 1957 that defects existed and corrective work had to be done immediately (Exh. D–4).

Farnsworth, in turn, performed immediately remedial work on twelve slabs at a cost of $870.00. This was done without notification to Dixie. However, on April 22nd, Farnsworth notified Dixie of the government's demand for sending via air mail and special delivery its April 22nd letter which read in pertinent part as follows:

"* * * you are hereby notified that we have, today, received a letter (copy enclosed) dated 18 April 1957 from the Resident Engineer, U. S. Corps of Engineers, advising us that *some of the slabs do not meet the contract requirements and that corrective work is necessary prior to laying asphalt tile floors.*

"* * * in order not to delay progress of the job, it has been necessary for us to undertake corrective work on the first several slabs immediately and without notification to you * * *

"We have checked * * * slabs throughout the Airmen's area and *it appears that some corrective work work will have to be done on most of them* to meet the Corps of Engineers requirements. Accordingly, it is requested that you and the Great American Surety Company representative *make an inspection, if that is your desire, so that the progress of the job will not be delayed.*"

Dixie received Farnsworth's April 22nd notice letter on April 23rd. On April 26th Thames, Peters and the plaintiff all visited the job site where they inspected and discussed the work with Farnsworth's superintendent Pope, and General Adjustment Bureau's local manager, Durrett. Durrett was present as a representative of Great American Indemnity Company, the surety on Thames' bond (Tr. 5, 18–19, 45–47; Cunningham

deposition, pgs. 3–19). At this conference evidence of slab defects was observed by all parties and it was agreed that Farnsworth should perform the necessary corrective work.

After concluding the on-site inspection in Lake Charles on April 26, 1957 and returning to Shreveport, neither Thames, Goodman, nor the attorney Peters ever did anything further toward correction of the defective work themselves. They did not return to the site. They did not make any further inspections. They did not have anyone else other than Farnsworth perform for them any corrective work. They did not communicate with Durrett or anyone else about remedial progress, but on April 29, 1957, Mr. Gallinghouse, attorney for Farnsworth, wrote the following letter to Mr. Peters, attorney for Goodman and Thames:

"Charles M. Peters, Esq.
"Sklar Building
"Shreveport, Louisiana

"Re: Farnsworth—Dixie
"Our file 11,760

"Dear Charlie:

"We confirm our telephone conversation of this morning, during which you informed us that, on Friday, April 26, 1957, you and your client, Mr. James A. Thames, and Mr. Durrett, representing the Great American Indemnity Company, visited Lake Charles Air Force Base and inspected some of the construction thereon.

"You informed us that you inspected the first eleven of the sixty-seven units in the construction sequence, and observed the condition of the building slabs. You have authorized Farnsworth to do the remedial work that is necessary to satisfy the requirements of the resident engineer. It is understood, of course, that the cost of this work will be deducted from any amount which might otherwise be due to Thames and/or Great American under the October 31–56 agreement.

"As we explained to you, Farnsworth will maintain accurate and detailed records on each of the sixty-seven units, insofar as the cost of correcting any defects in Mr. Thames' work is concerned. This statement will include a description of the defective work, an explanatory note of the resident engineer's exceptions thereto, and a detailed breakdown of the remedial work done by Farnsworth, including the cost thereof. Farnsworth will segregate the cost of this remedial work from other work done on this job. A statement of the remedial work will be furnished to you periodically.

"It is imperative that further delays in completing the work be avoided. Accordingly, we ask that you please instruct us as to whether Mr. Thames and Great American will make any future inspections, and the procedure you want to establish for Farnsworth's correction of any defects that may be discovered.

"We ask that you please let us have a statement of Mr. Thames' position by return mail.

"Cordially,
"s/ Deutsch, Kerrigan and Stiles"

On May 2nd Mr. Peters answered this letter as follows:

"Mr. Gerald J. Gallinghouse
"Deutsch, Kerrigan & Stiles
"Counsellors at Law
"Hibernia Bank Building
"New Orleans 12, Louisiana
    "RE:   Farnsworth—Dixie
        "Your File 11,760

"Dear Jerry:

"With regard to our telephone conversation and your letter of April 29, 1957, concerning the remedial work on the building slabs at Lake Charles Air Force Base, necessitated by the Corps of Engineers interpretation that the contract term 'smooth and level' permitted a maximum tolerance of one-eighth inch in ten feet, as explained to us by your Construction Superintendent Mr. Pope, this letter will serve as a memorandum of intent.

"On Friday, April 26, 1957, the writer, in company with Mr. Thames, Mr. G. S. Goodman, assignee and Mr. Durrett, representing Great American, inspected the first eight houses in the construction sequence, and three additional houses in the second line. We were unable to discuss this matter with the Resident Engineer and have accepted Mr. Pope's explanation of their requirements as to tolerance. Of the buildings inspected, eleven living units had been inspected by the Engineers, requirements apparently made, and remedial work undertaken as of the date of their inspection. As I recall three living units had already been accepted and the asphalt tile floors laid, and therefore were not susceptible of inspection.

"At the outset, your attention is directed to the fact that Mr. G. S. Goodman is assignee of the rights of Mr. Thames in and to the retainage and therefore has a vested interest in this matter. As you have previously been advised I represent Mr. Goodman, and it is requested that I be shown as an information addressee on future correspondence as this situation develops.

"At the time of our inspection it was impossible to see more than the units inspected, for the reason that additional units had not been cleaned or inspected by the Corps of Engineers. The obvious difficulty in having to clean these floors more than one time was explained. Therefore, it appears that the total nature and extent of remedial work requirements in the sixty-seven slabs constructed by Mr. Thames, will not be ascertainable for another sixty days or so. It appears that they will probably be cleaned, inspected, and requirements made, or accepted in varying numbers and intervals. For that reason it appears that the most efficient

and economical way to proceed, with some protection to the parties involved, is for Farnsworth to correct such defects as requirements are made by the Resident Engineer pursuant to the following:

"(1) Farnsworth to maintain accurate and detailed records on each of the sixty-seven houses, insofar as the cost of correcting any defects attributable to Dixie Paving is concerned, this statement to include a description of the defective work, an explanatory note of the Engineers' exception thereto and a detailed breakdown of the remedial work done by Farnsworth, including the cost thereof; Farnsworth to segregate the cost of the remedial work from other work done on the job; this statement to be furnished to me at regular intervals as the work develops.

"(2) As the requirements are made for remedial work, it is requested that some method be established for notification to me and I will have a local inspection made on such requirements. It is contemplated that this will probably be handled through Mr. Durrett of the General Adjustment Bureau in Lake Charles, so no loss of time will be involved.

"(3) That this procedure is suggested subject to any requirements that Great American may have on the same subject.

"(4) That this procedure remain in effect so long as it appears to be working in a manner satisfactory to all parties involved.

"It is sincerely hoped that in the interest of the parties this problem can be dealt with efficiently and economically in order that loss may be minimized.

"Trusting that this letter contains the information required.

　　"Yours truly,
　　"s/ Charles M. Peters"

Then on May 3rd, Mr. Gallinghouse answered Mr. Peters' letter of May 2nd:

"Charles M. Peters, Esq.
"Sklar Building
"Shreveport, Louisiana
　　"Re:　Farnsworth—Dixie
　　　"Our file 11,760

"Dear Charlie:

"We thank you for your May 2 letter. The procedure outlined by you should be satisfactory, if the inspections by Mr. Durrett are promptly made.

"We have forwarded copies of your letter to Farnsworth for the guidance of their field personnel.

"With best regards, we are
　　"Cordially,
　　"s/ Deutsch, Kerrigan & Stiles"

It is obvious from these letters and from what subsequently transpired that Farnsworth was under the impression that Durrett was representing not only the surety on Thames' performance but also Thames. Mr. Peters did state in his letter that he expected Farnsworth to furnish him detailed records as the work developed. This was never done but such was furnished regularly to Durrett and some five months later Thames received from Farnsworth notification that his $15,556.93 was gone and he, Thames, and his surety owed Farnsworth $1,000 in addition thereto for corrective work. It should be noted here before we leave this phase of the case that Mr. Gallinghouse in his letter of May 3rd, in which he accepted the procedures outlined by Mr. Peters, conditioned this acceptance on the fact that Mr. Durrett would make inspections promptly. Certainly this sufficed to show Mr. Peters that Farnsworth was operating under the impression that Durrett was inspecting for them, too. However, we hasten to add that we are not holding that Durrett was an agent of

Thames. We are merely holding that these subsequent letters never did really bring about a clear understanding or meeting of the minds.

Now, what was Durrett doing all this time? He visited the job almost every day as a representative of Thames' bonding company, and examined Farnsworth's detailed field records of materials, equipment, and labor used in performance thereof and reported regularly to Great American (Exhibits Durrett–1 through Durrett–20). Then, too, Great American kept its attorney, Mr. Christovich, closely advised, and he in turn participated in some exchange of correspondence with attorneys for Dixie, Goodman and Farnsworth (Christovich Deposition, pgs. 19–37).

The remedial work was performed by Farnsworth between late April and mid-September in 1957. Its final accounting showed that $16,562.18 was spent for labor, materials, equipment rentals and overhead; $15,785.53 of this amount was attributable to rectifying defects in the house slabs, with $195.10 covering street paving defects and $581.55 allotted to sealing street paving expansion joints. This total expense was backcharged against the retainage held under the take-over agreement.

Farnsworth's counsel contend that because their expenditure on the corrective work exceeded by $1,005.25 the amount of retainage being held, Farnsworth was absolutely right in reimbursing itself with all the retainage.

Subsequently, Goodman asserting the assigned rights of Thames, filed this suit to recover the retainage from Farnsworth.

This Court does not believe that there exists any serious factual disputes and we think that the principal issue is whether or not Farnsworth gave Thames the "notice" required by the October 31, 1956 take-over agreement. We feel that there are three other issues;

(1) Was Farnsworth within its legal rights in backcharging the remedial work performed before April 22, 1957 when admittedly no notice was given prior to that date?

(2) Was the $581.00 street paving expense a proper item for "corrective work" backcharged or was it merely "incomplete work" and not chargeable?

(3) Was the amount Farnsworth charged for labor, material, equipment rentals and overhead fair, reasonable, and accurate under the total circumstances?

█ We believe that Farnsworth's notice to Thames was sufficient under the contract. This notice appears in Exhibit D–4. Farnsworth was obligated to give Thames and Great American a written notice of any defects discovered in Thames' work, and this had to be done within five days after such discovery. Farnsworth did that. The government discovered defects and wrote Farnsworth about it on April 18, 1957, and on April 22, 1957, Farnsworth sent its formal notice to Thames, suggesting that he and his surety inspect if they wished.

Under the agreement of October 31st Thames and Great American then had five days after receiving Farnsworth's notice within which to inspect the work. This was done when Thames and Durrett participated with others in the on-site inspection of April 26th.

I just do not believe that the agreement warrants the view of plaintiff that Farnsworth was required under the circumstances here to send Thames a new notice any time there was an additional defect found. Certainly, under the circumstances of this case where a single notice had been sent and where the notice is rather broad and where the sub inspects the work and authorizes the prime to do it, there is no requirement of a separate written notice every time another defect was discovered.

Now, of course, the subsequent correspondence between Mr. Gallinghouse and Mr. Peters did result in a misunderstanding, and on that phase of the case I repeat that there was no meeting of the minds. It may well be that Durrett represented Thames for notice purposes, but this court does not believe that the evi-

dence establishes this by a preponderance.

## REMEDIAL WORK PERFORMED BEFORE APRIL 22, 1957

 Remedial work in the amount of $870 was performed before April 22, 1957. Farnsworth had no valid right to backcharge this amount because the notice was a condition precedent to their entitlement to make the backcharge and they did not give this notice until April 22nd. We find that Thames' subsequent conduct did not constitute a waiver of notice requirement as to this $870.

## THE JOINT SEALING CHARGE FOR THE STREET PAVING EXPENSE

It is clear to us that this item of $581 for street paving was something that Thames did not do as opposed to something that he did badly and therefore it was incomplete, not defective work. Accordingly, this $581 did not constitute a valid backcharge.

## FARNSWORTH'S CHARGES

We agree that there is no evidence in the record to show that Farnsworth's labor, material, and equipment rental for the aggregate corrective work was not fair, reasonable, accurate and based on actual expenditures. However, under the unusual facts of this case (and we make particular reference to the misunderstanding between Mr. Peters and Mr. Gallinghouse) we feel that Farnsworth's charge of 5% job overhead and 5% main office overhead is not equitable. Accordingly, we allow Farnsworth a backcharge of 5% job overhead but deny the 5% charged for main office overhead.

## CONCLUSION

The evidence supports a finding herein for defendant that Farnsworth is entitled to backcharge Thames with $14,355.2.[1] Plaintiff is entitled to a judgment for the balance of the retainage. Accordingly, there is judgment in favor of plaintiff and against the defendant for $1,201.31, with 5% per annum interest from day of judicial demand until paid.

| | | |
|---|---|---|
| 1. Total backcharge claimed | | $16,562.18 |
| Less backcharge disallowed in connection with claim made before notice, and claim for non-corrective work | | 1,451.00 |
| | | 15,111.18 |
| Less 5% disallowed as main office overhead | | 755.56 |
| | | 14,355.62 |
| Funds withheld for corrective work | | 15,556.93 |
| Less backcharge allowed | | 14,355.62 |
| | Due plaintiff | $ 1,201.31 |